*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 6, 2020

**BY ECF**

The Honorable Paul A. Crotty
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Jamal Simon*, 18 Cr. 339 (PAC)

Dear Judge Crotty:

  The defendant in the above-captioned case is scheduled to be sentenced on January 9, 2020, at 11:30 a.m. The Government respectfully submits this letter in connection with sentencing. For the reasons set forth below, the Court should impose a sentence within the applicable Guidelines range of 121 to 155 months' imprisonment.

  **I.** **Offense Conduct**

  Simon was the leader of a wide-ranging scheme (the "Fraud Scheme") that involved unlawfully obtaining personally identifiable information of other individuals (including names, addresses, phone numbers, email addresses, birthdates, Social Security numbers, bank account numbers, credit and debit card numbers, and cellphone service provider account numbers); impersonating those individuals in order to obtain unauthorized access to their bank, credit and debit card, and cellphone service provider accounts; using such access to, among other things, facilitate the fraudulent transfer of funds to other bank accounts controlled by members of the conspiracy and the unauthorized purchasing of merchandise and gift cards at retail stores. In total, members of the conspiracy unlawfully obtained more than $3,500,000 and attempted to obtain more than $6,000,000. (PSR ¶¶ 22-23.)

  To carry out the Fraud Scheme, members of the conspiracy obtained victims' personally identifiable information from various sources, including the dark web and commercial establishments at which members of the scheme worked. After obtaining a victim's personally identifiable information, conspirators typically manufactured fraudulent credit or debit cards linked to victims' accounts at financial institutions in order to access those accounts to make fraudulent purchases or wire transfers. (PSR ¶¶ 23-24.)

In some cases, members of the conspiracy, including Simon, attempted to "port"[1] (i.e., transfer) a victim's telephone number to a cellphone controlled by a Fraud Scheme participant. Once the victims' telephone numbers were "ported" to cellphones controlled by Fraud Scheme participants, the Fraud Scheme participants would place telephone calls from those cellphones (to which the recently ported numbers were assigned) to the victims' financial institutions. In most cases, the relevant financial institution's telephone system automatically recognized the incoming telephone numbers as belonging to their account holders and, on that basis, required fewer pieces of identifying information to authenticate the identity of the callers. Simon and/or his co-conspirators answered the limited set of authentication questions posed by the financial institution's customer service representative and then requested that (a) funds be sent via wire transfer to various accounts with other financial institutions and/or (b) "replacement" credit cards be sent to an address not associated with the account holder. In other cases, Simon used the "ported" cellphones to approve fraudulent purchases when a victim's financial institution texted or called a victim's telephone number to verify the propriety of the fraudulent purchases.

Simon was at the top of the Fraud Scheme—directing others' conduct and controlling the proceeds of their fraudulent purchases. To that end, Simon was involved in nearly every facet of the Fraud Scheme. His roles included, among others, unlawfully obtaining victims' personally identifiable information; directing others to manufacture counterfeit credit cards encoded with victims' banking information; porting victims' telephone numbers to cellphones controlled by Simon; impersonating victims during calls with credit card companies in which he requested "replacement" credit cards; directing co-conspirators to purchase merchandise with fraudulent credit cards. (PSR ¶ 23.)

### A. Obtaining Personally Identifiable Information

Simon obtained victims' personally identifiable information from various sources, including the dark web and commercial establishments at which members of the scheme worked. For example, Simon obtained personally identifiable information from co-defendant Jillian Walcott, who misappropriated victim information from the urgent care clinic that employed her. During an intercepted call between Simon and Walcott on or about March 21, 2017, Simon directed Walcott to steal ten victims' personally identifiable information from the urgent care clinic where Walcott worked:

| WALCOTT: | "I got probably like 20 left." |
| SIMON | "Oh yeah, oh yeah." |

---

[1] "Porting" refers to a formal technical process whereby an existing telephone number is reassigned to a different cellphone. Initiating the porting process without authorization of the owner of the cellphone number is a critical aspect of the scheme described herein, because credit card issuers often contact their customers via the cellphone number on file when the issuer detects suspicious activity on a customer's account. If a member of the scheme has control of the cellphone number, then that member can falsely confirm the propriety of fraudulent transactions.

| WALCOTT | "Then I go back to work this week, so, tomorrow, Thursday and Friday, I'm gonna have more." |
| SIMON | "Send ten in the morning." |
| WALCOTT | "Ten of them?" |
| SIMON | "Yeah, send ten in the morning. Me and my team, we don't play." |

### B. Obtaining Fraudulent Credit Cards

After unlawfully obtaining victims' personally identifiable information, Simon fraudulently obtained credit cards linked to the victims' bank accounts. Simon did this in two principal ways: (i) manufacturing counterfeit credit cards encoded with victim banking information; and (ii) requesting that replacement credit cards from the victims' credit card companies be sent to addresses Simon or his co-conspirators controlled. To manufacture counterfeit credit cards and identifications, Simon primarily relied on co-defendant Darrel Davidson, a/k/a "Eddie Gray." Simon frequently provided victim information to Davidson and directed him to manufacture counterfeit credit cards with that information. For example, at approximately 11:37 a.m. on or about March 21, 2017, Simon called Davidson and directed Davidson to create four false identification documents and/or counterfeit credit cards. On or about April 5, 2017, during an intercepted call with Simon, Davidson stated, in substance and in part, that he would "cook up" a counterfeit credit card for Simon.

Simon also relied on other individuals to manufacture counterfeit credit cards. During an intercepted call on March 30, 2017 between Simon and an unindicted coconspirator ("CC-1"), Simon said, in substance and in part, that he would send CC-1 "the shit" for CC-1 to put on a "piece," which referred to a counterfeit credit card.

Simon would also obtain credit cards directly from credit card issuers and financial institutions. To do this, Simon would call a credit card issuer, impersonate a victim, and request that the credit card issuer send a replacement credit card to an address selected by Simon.

Prior to impersonating victims during calls with credit card issuers, Simon would frequently port a victim's cellphone number to a cellphone controlled by Simon. For example, at approximately 12:49 p.m. on or about March 20, 2017, Simon placed a telephone call to a cellphone insurer and support service company (Cellphone Company-1") with the apparent purpose of porting a victim's ("Victim-1") cellphone number to a cellphone operated by Simon. During that call, Simon impersonated Victim-1 and provided to Cellphone Company-1 the last four digits of Victim-1's Social Security number. At the conclusion of the telephone call, it appeared that Simon's new subscriber information module ("SIM") card had been activated with Victim-1's cellphone number.[2] In other words, Victim-1's cellphone number was controlled by one of Simon's cellphones.

---

[2] A SIM card is a memory chip in which certain information, such as subscriber information, is stored. Among the information stored on a SIM card is a serial number and a customer account

The following day, Simon placed a telephone call to Victim-1's credit card company ("Card Issuer-1"). During that call, Simon impersonated Victim-1, and provided to Card Issuer-1 Victim-1's telephone number and account PIN. Simon then requested that a replacement card be issued for Victim-1 and that it be sent to a particular address in Brooklyn, New York, that was controlled by co-defendant Darren Davidson. At approximately 6:18 p.m. on or about March 22, 2017, Simon placed a telephone call to Card Issuer-1. During that call, Simon impersonated Victim-1 and provided Victim-1's Social Security number and account PIN, as well as the last five digits of Victim-1's replacement credit card. At Simon's request, Card Issuer-1 activated the replacement credit card. In other words, by unlawfully obtaining Victim-1's personally identifiable information and impersonating Victim-1 during calls with Card Issuer-1, Simon had obtained Victim-1's credit card directly from Victim-1's credit card issuer.

### C. Making Unauthorized Purchases of Merchandise

After obtaining counterfeit or replacement credit cards encoded with victim banking information, Simon distributed the credit cards to co-conspirators and directed them to purchase expensive merchandise with the credit cards. For example, at approximately 6:32 p.m. on or about March 23, 2017, Simon placed a call to co-defendant Rashaun McKay to discuss purchasing merchandise using Victim-1's credit card. Simon asked McKay whether, "they got shit in there," and McKay responded, "they got like two, four, five pros. I'm about to get two pros. They gonna have three left. And they got PlayStations."[3] Approximately thirteen minutes later, Simon called McKay again and asked whether the fraudulent purchases went through. McKay responded, "yeah." Simon then exclaimed, "booyah!"

Simon also relied on, among others, co-defendant Megan Montoya to make fraudulent purchases with victims' credit cards. For example, on or about April 6, 2017, Simon placed a call to Montoya, who was located in or around San Francisco, California, at the time. During that call, Montoya and Simon had the following dialogue:

| MONTOYA | "Hello?" |
| SIMON | "You good?" |
| MONTOYA | "Ummhmm" |
| SIMON | "It went through?" |
| MONTOYA | "Ummhmm" |
| SIMON | "Twenty-four thousand, bro!?" |
| MONTOYA | "Yes, sir." |
| SIMON | "You a fucking bad motherfucker." |

During this call, Montoya and Simon were discussing an unauthorized purchase that Montoya had made at a retail store in California using a fraudulent credit card furnished by Simon.

---

number, called, variously, the International Mobile Subscriber Identity (or Identification or Identifier), also known as the "IMSI number."

[3] "Pros" is believed to be a reference to the Apple iPad Pro.

Specifically, on or about April 6, 2017, Montoya used a fraudulent credit card to make a $24,342 purchase to a victim's credit card account. Montoya then made an additional unauthorized charge, for $9,201, at another retail store.

Later that same day, Simon and Montoya had another telephone call, during which Simon directed Montoya to "do one-hundred thousand for me. Do one-hundred thousand right now. . . . I'm dead serious." Montoya responded, "all right." Approximately one minute later, Simon again called Montoya and said, among other things, "I didn't say do one-hundred thousand in one swipe; you know that, right?" Montoya responded, "Yeah, of course, fool." Montoya then attempted to make several large purchases at the direction of Simon. Law enforcement agents who were monitoring the intercepted communications took steps to intervene in order to avoid the victim incurring the significant contemplated loss. Montoya then called Simon to inform that the police had arrived, and Simon directed Montoya, "don't talk to nobody," and confirmed that Montoya had hidden the counterfeit credit card.

Co-defendant David Boyd also made fraudulent purchases of merchandise at Simon's direction. On April 7, 2017, from 11:07 a.m. to 11:15 a.m., Boyd, acting at Simon's direction, made seven unauthorized charges, totaling $13,660, using a victim's American Express account at a retail store in New Jersey.

## II.     Procedural History

On May 14, 2018, Simon was charged as the top-named defendant in Indictment 18 Cr. 339 (PAC) (the "Indictment") with conspiracy to commit access device fraud, in violation of Title 18, United States Code, Section 1029(b)(2) (Count One); conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349 (Count Two); aggravated identity theft, in violation of Title 18, United States Code, Section 1028A (Count Three); misappropriating individually identifiable health information, in violation of Title 42, United States Code, Sections 1320d-6(a)(2) and (b)(3) (Count Four); and disclosing individually identifiable health information, in violation of Title 42, United States Code, Sections 1320d-6(a)(3) and (b)(3) (Count Five). (PSR ¶¶ 1-6.) On September 9, 2019, Simon pled guilty to Counts Two, Three, and Four of the Indictment pursuant to a plea agreement. (PSR ¶ 8.)

## III.    The Applicable Guidelines Range

### A. The Plea Agreement's Calculation

In the plea agreement, the parties stipulated that the combined offense level for Counts Two, Three, and Four is 30, that the defendant's Criminal History Category is I, and that the Guidelines Range is 97 to 121 months' imprisonment, to be followed by a mandatory two-year consecutive term of imprisonment on Count Three, yielding an effective range of 121 to 155 months' imprisonment. (PSR ¶ 8.) This Guidelines range assumes that the Court will apply a four-level role enhancement pursuant to U.S.S.G. § 3B1.1(a). However, under the terms of the plea agreement, the defendant may contest the applicability of this enhancement. Indeed, the Government understands that the defendant intends to do so.

## B. The Court Should Apply A Leadership Role Enhancement Pursuant To U.S.S.G. § 3B1.1(a)

The Government respectfully submits that there is an ample and undisputed evidentiary basis for the application of a four-offense level leadership role enhancement pursuant to U.S.S.G. § 3B1.1(a). No *Fatico* hearing is needed because the relevant facts are undisputed, and the Court can and should make a judgment based on its application of the Guidelines to those undisputed facts.

### 1. Applicable Law

Where a defendant contests the applicable Guidelines range, the Court may hold a hearing to resolve disputes over the applicable Guidelines range. However, the Court is not required to hold a hearing if the record permits the Court to make sufficient factual findings to support the Guidelines Range. *See United States v. Phillips*, 432 F.3d 86, 93 (2d Cir. 2005) ("The district court is not required, by either the Due Process Clause or the federal Sentencing Guidelines, to hold a full-blown evidentiary hearing in resolving sentencing disputes. All that is required is that the court afford the defendant some opportunity to rebut the Government's allegations.") (quoting *United States v. Slevin*, 106 F.3d 1086, 1091 (2d Cir. 1996)); *see also United States v. Molina*, 356 F.3d 269, 275-76 (2d Cir. 2004) ("A district court satisfies its obligations to make the requisite specific factual findings when it explicitly adopts the factual findings set forth in the presentence report.").

In making factual findings regarding the applicable Guidelines Range, "any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) (quoting *United States v. Simmons*, 164 F.3d 76, 79 (2d Cir. 1998)). This includes hearsay evidence, which is admissible at sentencing. *Id.* at 244; *see also* U.S.S.G. § 6A1.3(a) ("[T]he court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.")

Section 3B1.1 of the Guidelines instructs district courts to increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). This enhancement is appropriate where the defendant "played a crucial role in the planning, coordination, and implementation of a criminal scheme." *United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000). A "participant" is anyone "criminally responsible for the commission of the offense," regardless of whether that person has been charged or convicted. *See* U.S.S.G. § 3B1.1 cmt. 1. "In assessing whether a criminal activity 'involved five or more participants,' only knowing participants are included." *Paccione*, 202 F.3d at 624. As a threshold matter, "[t]he defendant himself is to be counted as one of the participants." *United States v. Norman*, 776 F.3d 67, 82 (2d Cir. 2015) (citing *Paccione*, 202 F.3d at 625). The Government therefore must identify only four other participants in Simon's scheme in order to satisfy the requirements of § 3B1.1(a). "It is enough to manager or supervise a single other participant." *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (citing *United States v. Payne*, 63 F.3d 1200, 1212 (2d Cir. 1995); *see also United States v. Zichettello,* 208 F.3d 72, 107 (2d Cir.2000) (noting that defendants are

subject to section 3B1.1(a)'s enhancement even if they each managed only one other participant, not five). "Once this management or supervision is found, the adjustment is mandatory." *Id*. (citing *United States v. Jiminez*, 68 F.3d 49, 51-52 (2d Cir. 1995)).

The Government must prove by a preponderance of the evidence that a defendant qualifies for a role enhancement. *See United States v. Molina*, 356 F.3d 269, 274 (2d Cir. 2004). "[A] sentencing court, like a jury, may base its factfinding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

### 2. Discussion

The Government agrees with the Probation Office's application of a four-level aggravated role enhancement pursuant to U.S.S.G. § 3B1.1(a). Simon was an organizer or leader of the Fraud Scheme because he set the agenda for the Fraud Scheme, led individual scams from beginning to end, managed and supervised other participants in the conspiracy, and he exercised discretion over both coconspirators and the Fraud Scheme's proceeds. In particular, the undisputed evidence includes, among other things, the following intercepted calls in which Simon exercised authority over other members of the Fraud Scheme or organized the Fraud Scheme's activities:

- During an intercepted call on March 21, 2017, Simon directed Montoya to use a particular counterfeit credit card to make fraudulent purchases—Simon instructed Montoya to use the "one" that "ends in 2008."

- During an intercepted call on April 6, 2017, Simon directed Montoya to make fraudulent purchases using a counterfeit credit card:

| SIMON | All right. You out of the sore, right? |
|---|---|
| MONTOYA | Yes. |
| SIMON | Go kill those now. You see what you just did for me, right? |
| MONTOYA | Yeah. |
| SIMON | Do one-hundred thousand right now. |
| MONTOYA | I want to dump this stuff in the car. |
| SIMON | Do one-hundred thousand right now girl. I'm dead serious. |
| MONTOYA | All right. |
| SIMON | I'm dead serious. Do one-hundred thousand and come see me. |
| MONTOYA | All right. |
| SIMON | And bring me some of that. |
| MONTOYA | All right. |
| SIMON | How's that sound? |
| MONTOYA | It sounds good. |
| SIMON | You have to do one-hundred thousand, so go do it. |

- Simon frequently directed Rashaun McKay, a/k/a "Buster" to make fraudulent purchases using counterfeit credit cards. For example, at approximately 3:14 p.m. on April 6, 2017, Simon placed a call to McKay and directed McKay to "push the same two-thousand," which is an apparent reference to making an unauthorized purchase of merchandise in the specific amount of $2,000. Two minutes after this call terminated, Simon called McKay and had the following conversation in which Simon again directed McKay to make a $2,000 unauthorized purchase:

| SIMON | You good? |
| McKAY | Yeah. |
| SIMON | It went through? |
| McKAY | No, I am waiting to get . . . the rest of this shit now. |
| SIMON | But the $2,000 when through? |
| McKAY | Nah, he hadn't swiped it yet. He getting the rest of the stuff. . . |
| SIMON | Bro, you doing the first transaction. . . |
| McKAY | All right. All right. I am about to do it right now. |
| SIMON | Make sure the first transaction is $2,000, bro. |

- Simon frequently directed co-defendant Darrel Davidson, a/k/a "Eddie Gray" to manufacture counterfeit credit cards that Simon would furnish to other members of the Fraud Scheme for the purpose of making unauthorized purchases. For example, on April 5, 2017, during an intercepted call between Simon and Davidson, Simon directed Davidson to "cook up" a counterfeit credit card.

- Simon frequently obtained personal identifiable information from the dark web or other members of the conspiracy, such as Jillian Walcott, for the purpose of manufacturing counterfeit credit cards that Simon distributed to other members of the Fraud Scheme for the purpose of making unauthorized purchases. For example, during an intercepted call on March 21, 2017 between Simon and Walcott, Simon directed Walcott to obtain personal identifiable information associated with ten victims.

- Simon exercised authority over the Fraud Scheme's illicit proceeds. For example, during an intercepted call on April 6, 2017 between Simon and Walcott, Simon explained that a co-conspirator asked Simon for a portion of the illicit proceeds and/ or merchandise purchased by Montoya at the direction of Simon.

The content of these intercepted calls, which cannot seriously be disputed, establish by a preponderance of the evidence that Simon was an organizer or leader of the Fraud Scheme. Simon

obtained personal identifiable information so that Fraud Scheme participants could manufacture counterfeit credit cards. Simon distributed these counterfeit credit cards to other members of the conspiracy for the purpose of making unauthorized purchases. Simon then directed Fraud Scheme participants to make the unauthorized purchases. As set forth above, Simon controlled the dollar amounts of the purchases and the items of merchandise that were to be purchased. Simon then exercised discretion over the proceeds from these unauthorized purchases and the distribution of the proceeds to others members of the Fraud Scheme.

Finally, the defendant cannot seriously dispute that the Fraud Scheme involved five or more participants or was otherwise extensive. Indeed, more than five participants in the Fraud Scheme have already pled guilty to participating in the conspiracy alleged in the Indictment: (i) Jamal Simon; (ii) Melvin Brown (PSR ¶ 17); (iii) David Boyd (PSR ¶ 10); (iv) Rashaun McKay (PSR ¶14); (v) Dwayne Norville (PSR ¶ 12); (vi) Jillian Walcott (PSR ¶ 16); (v) Megan Montoya (PSR ¶ 11); (vi) Darren Davidson (PSR ¶ 15); and (vii) Yvette Lubrun (PSR ¶ 9). The Guidelines define a "participant" as a person "who is criminally responsible for the commission of the offense, but need not have been convicted." *See* U.S.S.G. § 3B1.1 cmt. 1. Each of these seven individuals has been convicted and therefore is unquestionably a "participant" in the Fraud Scheme. And, as set forth herein, there are additional Fraud Scheme participants who have not yet been criminally charged.

### C. The Probation Office's Calculation

In the PSR, the Probation Office reached the same conclusion with respect to the calculation of the combined offense level for Counts Two, Three, and Four, but determined that the defendant has two criminal history points, which places the defendant in Criminal History Category II. (PSR ¶ 75.) Accordingly, the Probation Office calculated the applicable Guidelines Range to be 108 to 135 months' imprisonment, to be followed by a mandatory two-year consecutive term of imprisonment on Count Three, yielding an effective range of 132 to 159 months' imprisonment. (PSR ¶ 111).

### IV. Sentences Imposed on Co-Defendants

To assist the Court in assessing the relative culpability of the defendants, the Government provides the following chart of the defendants who have pled guilty in this case, listed in the order of their applicable Guidelines ranges (from highest to lowest):

| Defendant | Criminal History Category | Criminal Offenses | Mandatory Minimum (months) | Guidelines Range (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
| Jamal Simon | I | wire fraud conspiracy; aggravated identity theft; wrongfully obtaining individually | 24 | 121 to 155 | |

| Defendant | Criminal History Category | Criminal Offenses | Mandatory Minimum (months) | Guidelines Range (months) | Sentence of Imprisonment (months) |
|---|---|---|---|---|---|
|  |  | identifiable health information |  |  |  |
| Melvin Brown | IV | wire fraud conspiracy; aggravated identity theft | 24 | 65 to 75 |  |
| David Boyd | IV | wire fraud conspiracy; aggravated identity theft | 24 | 51 to 57 | 51 |
| Rashaun McKay | III | wire fraud conspiracy; aggravated identity theft | 24 | 51 to 57 |  |
| Dawdu Marriott | II | wire fraud conspiracy; aggravated identity theft | 24 | 39 to 45 | 40 |
| Dwayne Norville | IV | wire fraud conspiracy | 0 | 33 to 41 | 28 |
| Jillian Walcott | I | wire fraud conspiracy; wrongfully obtaining individually identifiable health information | 0 | 33 to 41 |  |
| Megan Montoya | III | wire fraud conspiracy | 0 | 33 to 41 | Time Served (83 days) |
| Darren Davidson | I | wire fraud conspiracy | 0 | 27 to 33 |  |
| Yvette Lubrun | I | wire fraud conspiracy | 0 | 15 to 21 | Probation |

## V. Discussion

### A. Applicable Law

Although *United States v. Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. 543 U.S. 220, 264 (2005). As the Supreme Court stated, "a district

court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available;" (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants;" and (7) "the need to provide restitution to any victims." 18 U.S.C. § 3553(a)(1)-(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant; and
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  A Guidelines Sentence Is Appropriate In This Case

The 18 U.S.C. § 3553(a) factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others who are similarly situated, to promote respect for the law, and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(A)-(C). These considerations weigh in favor of a sentence within the Guidelines Range of 121 to 155 months' imprisonment.

*First*, a sentence within the Guidelines Range would appropriately reflect the nature and seriousness of the defendant's conduct. The defendant was the organizer and leader of a massive Fraud Scheme. He obtained victims' personally identifiable information and then used such information to make or attempt to make fraudulent purchases of merchandise from retail stores that caused at least $2,430,771.05 in losses to at least ten victims, and attempted to cause significant additional losses. (PSR ¶ 47.) Indeed, as the leader and organizer of the Fraud Scheme, Simon was responsible for substantially more losses than any of the other eleven defendants. Overall, the Fraud Scheme caused losses of more than $3.5 million to victims and attempted to scam millions more.

*Second*, a sentence within the Guidelines Range is necessary to promote respect for the law and to deter others who are similarly situated from participating in similar schemes. Fraud schemes of this type are on the rise because the unscrupulous have found that identity theft is profitable and easy to implement and conceal from law enforcement. Following the nominal investment in

obtaining individually identifiable information and blank cards with magnetic strips, the crime carries no further financial cost, apart from the prospect of apprehension and criminal penalties. However, the likelihood of detection is substantially lower than many other theft offenses. Victims often do not realize that have been victimized for some period and are not able to report the fraud until well after funds have been stolen from their accounts and they have been substantially harmed. In addition, the investigation of cases such as these is extraordinarily resource-intensive for law enforcement, and requires a substantial investment of resources in order to reveal the activities of a scheme such as this and the identities of its members. Substantial punishment is required to counterbalance the general perception that this type of scheme carries low costs for perpetrators.

*Third*, a sentence within the Guidelines Range—like the one recommended by the Probation Office, of 132 months' imprisonment (PSR at 24)—is needed to deter this defendant from committing additional crimes and to protect the public. The defendant's conduct after he was indicted in this case is extremely troubling. On May 23, 2018, the Indictment was unsealed, and law enforcement arrested Simon's co-defendants—his close associates and the mother of his daughter, co-defendant Demali Mosely. That same day, the FBI also executed a search warrant in Simon's Brooklyn residence. For the next seven months, Simon fled from law enforcement, often using deliberate and sophisticated means to evade detection. Indeed, over the seven months that Simon was a fugitive, he used at least eight different cellphones to avoid detection and routinely changed residences in Florida (often paying cash to rent homes).[4] For the entire seven month period that Simon was a fugitive, he continued to engage in the same offense conduct. Financial institutions reported fraud on seven of the eight cellphones that Simon used while hiding from law enforcement. In fact, Simon was engaged in the offense conduct up until the day before he was arrested. Simon's stunning conduct during the seven months he was a fugitive demonstrates that little will stop him (including serious federal criminal charges) from breaking the law. Accordingly, the Court should sentence the defendant to a significant term of imprisonment, and one within the Guidelines Range, to ensure that the defendant is adequately deterred and to protect the public from his alarming pattern of crime for a meaningful period.

---

[4] In recorded jail calls after his apprehension, Simon speculated that the FBI must have located him through cellphone location information. Simon stated, in sum and substance, that he should have used a cellphone without a SIM card.

## VI. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence on the defendant within the Guidelines Range of 121 to 155 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

By: _____
Nicholas W. Chiuchiolo
Robert B. Sobelman
Assistant United States Attorneys
(212) 637-1247/2616

Cc: Albert Dayan, Esq. (by ECF)